### J. Q. POWELL v. STATE OF FLORIDA

23 So. (2nd) 727                                    June Term, 1945
November 16, 1945                                      Division B

*Coe & Eggart,* for appellant.

*J. Tom Watson,* Attorney General, and *Reeves Bowen,* Assistant Attorney General, for Appellee.

THOMAS, J.:

The appellant was found guilty as charged in an information containing two counts. In the first it was alleged that he kept a disorderly house where he caused men and women of evil name, fame, and conversation to foregather, and that he permitted them to tipple, quarrel, and curse, to the common nuisance of the people (the common law crime of maintaining a disorderly house); in the second, that defendant maintained a place for the purpose of lewdness and prostitution (the statutory offense denounced in Section 796.01 Florida Statutes, 1941, and F.S.A.). But two questions are presented here for our consideration—namely, (1) the competency of the testimony of one witness who resided half a mile from appellant's place of business, and (2) the sufficiency of the testimony as a whole to justify the verdict.

Appellant operated a place of business consisting of ten houses, a dance hall, a bath house, and eight cabins, known as Horseshoe Swimming Pool and situated a few miles from the City of Pensacola. One night in April, 1945, two deputy sheriffs went there, after receiving a complaint, and found in each of two cabins a man in bed with a prostitute and in a third a woman known to the officers as a strumpet bedded with a man whom she later claimed to be her husband. Despite this assertion of her married state she gave remarkable testimony, upon being introduced as a witness for the state, which we think not only established her own character but reflected the nature of the place where she resided. She admitted having

been arrested there before when found in a cabin with a soldier, and, upon being asked her companion's identity, replied, "I don't know. He had red hair." She was then asked whether at the time of the arrest immediately preceding this prosecution she was occupying a part of the building where the proprietor stayed, and answered in the affirmative. After the first arrest, for cohabiting with the soldier, she served a period of fifty days or more in jail, then resumed her position as an employee of the appellant. This same woman further stated that she later "went off and got tight and left again"; that when she had served her present sentence she intended to return to her employment.

It was related by the deputies that at the time they apprehended the couples whom we have described they obtained the register bearing the names of appellant's guests, but could not find in it the names of the persons in their custody.

It was testified by the sheriff of the county, the two deputies, and a constable that the place was known as one of prostitution. The constable estimated that he had taken twenty-five or thirty "drunks" into custody there and that two-thirds of them were women. He also told of seeing drunken persons going to and from the place and of hearing them curse in boisterous tones. He said that patrons of the place, while driving to and from it, passed many dwellings.

The witness, one Mrs. Fell, whose testimony appellant insists was incompetent, gave an account of her experiences with reference to these customers of appellant and voiced her objections to the rowdiness and ribaldry which emanated from the place he operated. She lived half a mile away on a road leading to it. Despite the distance, she said she was often annoyed by the noise of the juke organ and the shouting of the habitues. So loud was the tumult even at that distance that it interrupted the sleep of herself and her family. Cars passed to and fro at high speed with drunken passengers— plenty of them—"whooping and hollering." No other similar places were located on the highway in that direction. Many of these revelers were "in bathing suits and in each other's laps and on fenders and piled in the cars, arms around each

other's necks, etc." The cursing, she said, was "pretty bad" at night.

Another resident lived a mile away, yet could hear the blare of the juke box and the screaming and yelling from passengers of cars passing her home. The din was so great that at times her sleep was disturbed. She reported also that the fuss interfered with services in a church she attended not far away.

It might be said, then, that testimony of three categories was introduced by the state to establish the disorderly nature of this place of business—namely, acts of illicit intercourse at the time of the visit of the officers, its reputation in the community, its interference with the peace and comfort of persons living thereabouts.

Of course this testimony on behalf of the state did not pass uncontradicted. For instance, the appellant denied the charges and claimed that the three women to whom we alluded at the outset were actually his employees and were not, therefore, required to register. He said he rented four of his cabins to families and that he had on several occasions let them to sailors and their wives who could not find other quarters. This question was propounded to him: "Did they not rent them for overnight and in an hour or so be out?" and he answered, "Probably so." He was asked the further question whether it was not true that on occasions he rented the same cabins more than once a night, and he said, "Maybe so." Four neighbors appeared in his defense. One of them who lived nearly a mile away had not been vexed by the noise of the Horseshoe Swimming Pool. Another, a woman who occupied one of appellant's cabins had not seen anything amiss in the conduct of persons frequenting the premises, but admitted having noticed a few fights, people drinking, and having heard a little cursing "once in awhile." Another neighbor living a mile away knew of no offensive noises issuing from appellant's place of business and had seen nothing indicating that it was a harbor for lewd women. This particular witness, although he was ignorant of women being arrested for entertaining men in their cabins, when asked if he knew of their indulging in

prositution and lewdness, said, "I left there when that took place." Still another neighbor residing six or seven blocks distant had "seen . . . [no] trouble coming from his place of business that would render it offensive to the decent people living in the neighborhood," and had seen nothing marking it as a refuge for lewd women practicing prostitution.

Two customers came to appellant's aid. One called at the Horseshoe Swimming Pool once a month and, although on these visits he had noticed drinking, he saw no evidence of the operation of a house of ill fame. Another thought nothing offensive occurred there "outside of drinking beer," and was aware of nothing indicating that the place was a retreat for prostitutes.

A former employee saw no disorderliness and thought the place was not a harbor for immoral women. She had heard cursing, though, and thought the juke organ could be heard "half or a quarter of a mile" away. She had observed intoxicated persons around the place.

We have endeavored to give fairly a resume of the testimony offered by the state and by the defendant to establish and refute the maintenance of Horseshoe Swimming Pool as a disorderly house prohibited by common law and statute. It seems to us that the state did not fail in its effort to prove the material allegations of both counts of the declaration. It occurs to us that the very character of the three women who were surprised by the sheriffs in their unlawful practices, coupled with the admission of one of them that she had been apprehended with a man whom she knew only by the color of his hair, her subsequent welcome to the premises by the appellant, and her intention to return there when she has served her present sentence all establish that he well knew the purpose for which at least some of his cabins were occupied. Strengthening this is the evidence of the general reputation of the place in the community. Out of fairness to the appellant it should again be noted that four cabins were said to be rented to married war workers, but, even so, these tenants could not furnish an atmosphere of respectability sufficient to cloak the lascivious conduct of the other occupants. And

finally, it is quite significant to us that the appellant gave equivocal answers to the questions whether on occasion cabins were rented by couples pretending to be married who stayed but an hour or so, and on occasion cabins were rented several times during a single night. The refutation offered by the defendant and his witnesses was the concern of the jury, and if it chose to disregard this version, there was ample evidence on the part of the state to justify the verdict of guilty.

We do not feel warranted, either, in disturbing the verdict on the theory that some of the state's evidence, typified by the version of Mrs. Fell, pertained to occurrences so far removed from the scene as to render it incompetent. She lived less than a mile from the resort in question—so near that the hullabaloo created there interfered with her peace and comfort. No similar places were situated on the highway in that direction. It would require a strained construction to hold that there was no reasonable or logical connection between the clamor of juke box and inebriates at Horseshoe Swimming Pool and noisy roisterers clad in bathing suits embracing one another amorously on the highway within hearing of the place. Such evidence was plainly relevant to the first count, charging a nuisance.

The element common to both counts of the information— that is, the character of the persons joining in and helping produce the uproar, is, we believe, apparent from what we have already written.

Affirmed.

CHAPMAN, C. J., BROWN and SEBRING, JJ., concur. ·